IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                  CRIMINAL ACTION NO. 2:12-cr-00068

JAMES A. MATHENY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are four pre-trial motions: (1) the United States' Motion in Limine to Exclude Any Reference to Defendant's Knowledge of the Victim's Status [Docket 33]; (2) the United States' Motion to Admit Specific Instances of Conduct in Rebuttal to Character Evidence as to James A. Matheny [Docket 35]; (3) Defendant's Motion to Suppress Evidence from Intercepted Telephone Communication [Docket 34]; and (4) Defendant's Motion in Limine [Docket 36.]

On April 18, 2012, the Court conducted a hearing to address the parties' pre-trial motions. Thereafter, the parties filed supplemental memoranda supporting their respective positions on the matters raised in the United States' Motion in Limine to Exclude Any Reference to Defendant's Knowledge of the Victim's Status. (Docket 43, 45.)

For the reasons given at the April 18, 2012, pre-trial motions hearing, the Court **DENIES AS MOOT** Defendant's Motion to Suppress Evidence from Intercepted Telephone Communication [Docket 34], **DENIES AS MOOT** Defendant's Motion in Limine [Docket 36], and **DEFERS** ruling

on the United States' Motion to Admit Specific Instances of Conduct in Rebuttal to Character Evidence as to James A. Matheny [Docket 35].

For the reasons that follow, the Court **DENIES WITHOUT PREJUDICE** the United States' Motion in Limine to Exclude Any Reference to Defendant's Knowledge of the Victim's Status [Docket 33.]

*I. BACKGROUND*

The following facts are for the most part undisputed. In February 2012, Special Agent Todd Berry of the Federal Bureau of Investigation ("FBI") was conducting an electoral fraud investigation in Lincoln County, West Virginia. (March 2, 2012, detention hearing transcript, at 11.) Special Agent Berry was assisted in the investigation by James D. Wise, an investigator with the West Virginia Secretary of State's Office. Mr. Wise previously worked as an FBI Special Agent for twenty-eight years. (*Id.*)

On February 28, 2012, somewhere between noon and 1:00 p.m., Special Agent Berry and Mr. Wise drove to Midkiff, Lincoln County, West Virginia for the purpose of interviewing members of the Matheny family about election fraud activity in the county. (*Id.*) By all accounts, Midkiff is a remote area and far outside the range of cellular telephone service. (*Id.*) Special Agent Berry was dressed in slacks, a collared shirt and no jacket. On his belt was his FBI badge and a sidearm. Mr. Wise was unarmed and carried a document folder. (*Id*. at 14.)[1]

Upon arriving in Midkiff, the men located Matheny Road. (*Id.* at 12.) As they drove down Matheny Road they saw a man who was standing in front of a home. (*Id.* at 13.) They continued

---

[1] It is unclear from the record what Mr. Wise was wearing at the time. At the March 2, 2012, detention hearing, Mr. Wise was asked on direct to describe what he was wearing on February 28, 2012. He responded, "I was dressed as I am now." (*Id.*)

2

driving another two hundred yards or so until they found a residence that they believed belonged to Defendant's son, James Richard Matheny. (*Id.* at 12.) They parked the car, got out, and Special Agent Berry knocked on the front door of the home. No one answered. (*Id.*) The men then drove back up the road to ask assistance from the man they passed. (*Id.* at 13.) When they arrived, they parked the car, got out, and walked into the yard. The man they had previously observed walked down some steps and met Special Agent Berry and Mr. Wise in the yard. (*Id.*)

What occurred next will be the principal factual dispute at trial. Mr. Wise testified at the March 2, 2012, detention hearing that he asked the man if "James Matheny had . . . resided at the residence we just left." (*Id.* at 14.) The man replied, "Yeah, Richard, Richard." (*Id.*) Mr. Wise then asked, "Is he around?" (*Id.*) The man replied, "He's at the hospital." (*Id.*) Mr. Wise then asked, "Does Donna also reside there?" (*Id.*) The man replied, "Well, Donna is the one in the hospital." (*Id.*) Mr. Wise then asked the man if he "could tell us his name." (*Id.*) The man said he was James Matheny (the Defendant in this case). Mr. Wise asked, "James A. Matheny?" The Defendant replied, "Yes" and "What's it about?" (*Id.* at 17.) Mr. Wise testified that he told the Defendant "We'd like to ask you some questions about the May, 2010, election in Lincoln County." (*Id.* at 14.) According to Mr. Wise's testimony, Defendant told Mr. Wise that "he had filled out the papers and mailed them in." (*Id.*) Mr. Wise then responded, "No, I'd like to show you a document." (*Id.*) Mr. Wise testified "And at that point in time, he [Defendant] said 'You're calling me a liar' and pulled a gun from his right side and pointed it at Special Agent Berry and myself." (*Id.*) The three men were standing fairly close together, only "two or three feet" apart. (*Id.* at 14.) Based on Mr. Wise's testimony, it appears that the gun was pointed at a downward angle at Mr. Wise's "lower extremities." (*Id.* at 23.) Mr. Wise and Special Agent Berry attempted to "talk the gun out of his

3

hand." (*Id.* at 18.) They told Defendant, "Relax. We didn't call you a liar. We just wanted to show you some documents." (*Id.* at 15.) Mr. Wise testified that they kept talking and the Defendant gradually moved back, as did Mr. Wise and Special Agent Berry. Defendant allegedly then told the men to get off his property or "I'll kill you." (*Id.* at 16.) Mr. Wise testified Defendant then "started moving towards his home, backing towards his home which allowed us to back off his property." (*Id.*) Mr. Wise and Special Agent Berry got in their car and Defendant went into his home. (*Id.*)

Mr. Wise and Special Agent Berry, because of the lack of cellular telephone service, drove to the West Virginia State Police Detachment in Hamlin, West Virginia and telephoned the Charleston FBI office. (*Id.*) Later that day, Special Agents obtained a federal search warrant and recovered two small caliber handguns from atop the refrigerator in Defendant's home. (*Id.* at 26.) Both guns had magazines loaded with ammunition, but neither firearm had a round in its chambers. (*Id.*) Defendant was placed under arrest and, in a post-arrest interview, identified one of these guns as the one he had during the encounter with Special Agent Berry and Mr. Wise earlier that day. (*Id.* at 26.)

It is undisputed that neither Special Agent Berry nor Mr. Wise identified themselves during their encounter with Defendant. Mr. Wise testified they did not have time to tell Defendant who they were. (*Id.* at 17, 19-21.)

Following Defendant's arrest, FBI Special Agent Robert B. Selbe interviewed Defendant's daughter, Katrina Diann Thacker. (Docket 33-2.) According to Special Agent Selbe's record of interview with Ms. Thacker, she advised that she telephoned her father after his encounter with Special Agent Berry and Mr. Wise but before Defendant's arrest. Ms. Thacker allegedly stated that her father advised her that he might be going to jail because he "pulled a gun on a couple of guys

4

who had asked about the election." (*Id.*) Defendant told Ms. Thacker that he saw "a strange silver car pull in and out of" her brother's driveway. (*Id*.) Ms. Thacker told Special Agent Selbe that her father would have been suspicious of an unknown vehicle on his road and that a large gate blocking the access road was erected to prevent people from traveling these back roads. (*Id.*) She stated that the residents in that area are concerned about "the number of pillheads in the area who do not work" and the resulting potential for criminal activity. (*Id.* at 2) Ms. Thacker stated that Defendant told her that when he told the men that he filled out the voting papers and mailed them, one of the men challenged him stating "no you didn't, we have the papers right here that states you did not fill them out yourself." (*Id.*) Ms. Thacker allegedly said Defendant thought the men were calling him a liar and he pulled his gun and told them they needed to leave. (*Id.*) Ms. Thacker, according to Special Agent Selbe, also said that her father made no reference to the men's identities or who they worked for. (*Id.*) She said that her father also said that if he had not been in so much pain, he would have punched the men. (*Id*. at 2) Based on Special Agent Selbe's report of interview, Ms. Thacker's recitation of her conversation with her father did not include any threat by Defendant to kill the men. (*Id.* at 1-2.)

On March 6, 2012, a federal grand jury returned a two-count indictment against Defendant charging him with assault with a deadly weapon on a federal officer and a person assisting a federal officer in violation of 18 U.S.C. § 111(b) and brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).

*II. DISCUSSION*

In its motion in limine, the United States asks the Court to exclude at trial any evidence or reference bearing on the question of whether Defendant was aware that Special Agent Berry was a

5

federal law enforcement officer or whether Defendant knew that Mr. Wise was assisting Special Agent Berry in the performance of his official duties. (Docket 33 at 1.) The United States contends that "[a]bsent any evidence of justification or self-defense," evidence of Defendant's knowledge of Special Agent Berry's and Mr. Wise's status and investigative activity is irrelevant under *United States v. Feola*, 420 U.S. 671 (1975). The United States claims that there is no factual basis for a self-defense or justification defense theory and, thus, the evidence of Defendant's knowledge of the men's status should be excluded at trial as irrelevant and confusing under Rules 401 and 403 of the Federal Rules of Evidence. (Docket 33 at 1, 41 at 1-2.)

Defendant responds that, although Defendant's knowledge of Special Agent Berry's and Mr. Wise's identities and activities is "not an essential element that must be proven under § 111," his knowledge of their status is relevant to a self-defense theory and "is essential to determine whether Mr. Matheny believed he was lawfully defending his property." (Docket 40 at 3, 5; Docket 45.)

    A.    *United States v. Feola*

The facts in *Feola* involved a botched heroin buy. *Id.* at 674-75. The defendants planned to sell fake heroin figuring that if the buyers became suspicious about the transaction, the defendants would just rob them of their drug buy money. *Id.* What the defendants did not know is that the buyers were undercover narcotics agents. *Id.* During the transaction, one of the defendants assaulted one of the undercover agents. *Id.* The defendants were charged with conspiring to assault and assaulting a federal officer in violation of 18 U.S.C. §§ 111 and 371. *Id.* The district court, without objection, instructed the jury that they were not required to find on either count that defendants knew that the undercover agent was a federal officer. *Id.* at 675. The court of appeals approved of the

6

jury instruction for the 18 U.S.C. § 111 count, but not the conspiracy count, and reversed the 18 U.S.C. § 371 conviction. *Id*.

The Supreme Court granted certiorari to resolve a circuit conflict on the scienter requirement in conspiracy cases arising under 18 U.S.C. § 111. *Id*. 675-76. In its analysis, the Court examined § 111's legislative purposes. The Court stated "we think it plain that Congress intended to protect both federal officers and federal functions" and that "furtherance of one policy advances the other." *Id.* at 679. The Court stated that Congress's legislative purpose was to ensure with "the highest degree of certainty" that those who killed or assaulted federal officers were brought to justice. *Id.* Providing a federal forum for these crimes was necessary because "prompt and vigorous" prosecutions in state court could not be ensured where the federal officer was conducting an unpopular investigation (*e.g.* prohibition, civil rights). *Id.* at 684. The Court concluded that

> in order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer. A contrary conclusion would give insufficient protection to the agent enforcing an unpopular law, and none to the agent acting under cover.

*Id.* at 684; *see United States v. Williams*, 604 F.2d 277, 279 (4th Cir. 1979) (citing *Feola*, 420 U.S. at 671 ) (stating that as a general rule, knowledge as to the identity of the victim is unnecessary for a conviction under 18 U.S.C. § 111. Knowledge may in certain circumstances be relevant if it relates to the existence of the necessary mens rea to justify a criminal conviction.)

In *Feola,* the Court reasoned that its holding "poses no risk of unfairness to defendants" nor is it a "snare for the unsuspecting" because individuals such as Feola know "from the very outset that [their] planned course of conduct is wrongful." *Id.* "The situation is not one where legitimate

conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him." *Id.* The Court then stated:

> We are not to be understood as implying that the defendant's state of knowledge is never a relevant consideration under § 111. The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of mens rea. For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.

*Id.* at 686 (footnotes omitted).

The Supreme Court cited four cases illustrating scenarios where a defendant's knowledge of the federal officer's identity may be relevant. One of those cases, *United States v. Perkins*, 488 F.2d 652 (1st Cir. 1973), involved federal undercover narcotics agents. There, the agents went to an apartment building in an attempt to buy drugs from a reputed drug dealer. *Id.* at 652. The apartment building custodian found out that a drug sale was occurring and, not knowing the officers were acting in an undercover capacity, brandished a club at the agents and ordered them to leave. *Id.* at 653. As the officers retreated, Perkins followed them and then ordered one of the agents to stand up against a wall. *Id.* Perkins yelled for someone to call the police. *Id.* A crowd gathered, a member of which had a rifle. *Id.* The agents fled and Perkins retreated, but then he somehow gained possession of the rifle. *Id.* He fired shots at the fleeing agents. *Id.* The First Circuit held that, in light of the district court's other jury instructions and Perkins' excessive conduct, the trial court's instruction that Perkins's lack of knowledge of the agents' identities was irrelevant to a conviction under 18 U.S.C. § 111 was correct. *Id.* at 654. The court, noting disagreement in the case law, believed it helpful to elaborate on the mens rea requirement under § 111. The court stated that § 111

8

is "not one of those statutes which have completely eliminated the requirement of mens rea." *Id.* at 655. The court stated that "mens rea would obviously be present in conduct which is unlawful of itself, *i.e.* an intentional assault." *Id.* Continuing, the court stated:

> There are, however, situations in which the defendant's lack of knowledge of the agent's status would be relevant. No court that we are aware of has held that a defendant who in good faith, because of ignorance of the officer's identity, believes that he is acting in lawful defense of his person or property and uses no more than reasonable force in effectuating that purpose, can be convicted simply by proof that in fact he was impeding an officer in the performance of his duties. In such a situation the defendant would lack mens rea unless he knew that his actions would impede a federal officer's performance of his duties—it is not enough for a conviction under the statute to prove simply the natural consequences of defendant's conduct, without proof of a criminal intent. In cases of non-assaultive interference with an officer, or of physical resistance sought to be justified as self-defense, if the defendant used no more than reasonable force, there would be no criminal intent in the absence of knowledge of the officer's status. Hence in these situations proof of such knowledge would be a necessary part of the government's case.

*Id.* at 654-65.

Another case, also noted approvingly by the Court in *Feola*, is *United States v. Goodwin*, 440 F.2d 1152 (3d Cir. 1971). There, an FBI agent arrested Goodwin on a fugitive warrant while Goodwin was stopped at a red light. *Id.* at 1154. As the agent approached the driver's side of the vehicle, the agent identified himself, but did not show his credentials. *Id.* Goodwin resisted arrest and, at trial, claimed he thought the agent was a bail bondsmen. *Id.* Following his conviction under 18 U.S.C. § 111, Goodwin (like Perkins) argued that the district court erred by refusing to instruct the jury that the prosecution was required to prove that he knew the agents were federal officers. *Id.* at 1155. In this pre-*Feola* decision, the court of appeals held that the Government's failure to prove scienter does not provide an absolute defense. *Id.* The court, however, stated:

> In holding that specific knowledge of the victim's status as a federal officer is not an essential element of the crimes enumerated in Section 111, we do not mean to

9

indicate that a defendant is precluded from showing that his use of force was defensible and justified. Since the statute does not encompass those types of 'public welfare offenses' which have abolished the requirement of mens rea, a mistake of fact which negates the existence of the necessary criminal intent will constitute a defense. Thus, a defendant may cast a reasonable doubt upon the existence of mens rea by showing that, under the circumstances, he reasonably believed the facts to be other than they were and that his actions would have been innocent had his belief been correct. In order to sustain its overall burden of proof, the Government must, of course, remove this doubt by offering rebuttal evidence to disprove the mistake.

Any distinction between those acts which would be criminal regardless of the victim's identity and those which would not is nothing more than the recognition that a mistake of fact may negate the existence of mens rea in some situations and not in others. One who commits in unprovoked assault, for example, cannot claim he lacked criminal intent simply because he did not know that his victim was a law enforcement officer. If he acts in resistance to an arrest, on the other hand, he may justifiably use reasonable force in self-defense if he neither knows nor should know that he is being arrested and reasonably believes that he is being subjected to a hostile attack against his person.

*Id.* (citations omitted).

In *United States v. Young*, 464 F.2d 160 (5th Cir. 1972), also noted in *Feola*, the defendant ran his car into a car driven by FBI agents who were attempting to arrest him. *Id.* at 162. The prosecution claimed Young was deliberately attempting to run over an FBI agent who had stepped out of the car. *Id.* Young contended that his actions were "simply a non-violent attempt to prevent two strange white men from stopping his path of travel." *Id.* The court of appeals vacated Young's conviction because the district court instructed the jury that it was immaterial whether Young knew the victims were agents. The court of appeals stated:

The portion of the instruction quoted first was broad enough to permit the jury to find Young guilty of the offenses charged even if the jury believed Young's testimony that he thought he was being harassed by local rowdies. Instead, the jury should have been clearly instructed that it could not find Young guilty of the offenses charged unless the jury believed that Young intended to threaten or attempted to injure [the Special Agent]; and that Young could not intend to threaten or to attempt to injure [the Special Agent] if Young acted out of a reasonable belief that [the Special

10

> Agents] were strangers who intended to inflict harm upon Young. Such an instruction would permit the jury to pass upon Young's contention that he had no unlawful intention to commit the offenses charged because he acted to protect himself and his fellow passengers.

*Id.* at 162-62. The court distinguished cases where, on the one hand, there is no doubt of the defendant's unlawful intention from those cases where, on the other hand, the defendant is unaware that the victim is a federal officer and, thus, unaware that the victim may have an "an official privilege to interfere with the defendant's person or freedom of movement." *Id.* In the former instance, "knowledge of the official capacity of the victim is invariably unnecessary; the assailant takes his victim as he finds him." *Id.* 163. In the latter instance, "the jury must be allowed to consider the defendant's evidence tending to show that he was ignorant of the official capacity of the victim. For only then can the jury give fair consideration to whether the "assault" was "an intentional act wilfully done without legal excuse." *Id.*

### B. *Analysis*

With this background, the analysis now turns to the merits of the United States' motion in limine. As a preliminary matter, the Court observes that United States fails to discuss *Perkins, Goodwin,* or *Young*—cases specifically noted by the Supreme Court as exceptions to its holding in *Feola*. Rather, the United States relies on *United States v. Williams,* 604 F.2d 277 (4th Cir. 1979), in support of its position. In that case, Williams assaulted a Deputy United States Marshal who was attempting to serve process on him. 604 F.2d at 279. The Deputy approached Williams from the rear and tapped him on the shoulder with the papers he was serving. *Id.* Williams swung around and struck the officer in the chest. *Id.* At trial, Williams denied striking the Deputy; rather, he claimed he had lost his balance and fell on the Deputy. *Id.* Williams also testified the Deputy did not identify

11

himself or show him his credentials. *Id.* Williams objected to the jury instruction that his knowledge of the Deputy's identity was irrelevant. *Id.* He claimed that his knowledge was an element of the offense that the prosecution must prove. *Id.* He requested no alternative instructions. *Id.* Following his conviction, Williams appealed. The Fourth Circuit affirmed citing *Feola*.

The United States' reliance on *Williams* is misplaced. The Fourth Circuit did not affirm Williams' conviction because a defendant in circumstances such as Mr. Matheny's is not entitled to a *Feola* exception jury instruction. Rather, Williams' conviction was affirmed because he never sought a *Feola* exception instruction, but rather clung to the position that the prosecution must always prove the defendant's knowledge. The court stated that had the evidence and Williams's theory of the case suggested it, Williams "might well have been entitled to a jury instruction relating to the exception set forth in *Feola*." *Id.* at 280. The court stated that "[k]nowledge may in certain circumstances be relevant if it relates to the existence of the necessary mens rea to justify a criminal conviction. If the defendant felt that the circumstances here brought this exception into play, he could have urged that defense, but he did not." *Id.* The court stated:

> Unlikely as it may seem in view of the record in this case, the jury could have believed from the defendant's acts (as described by the marshal), in contrast to the defendant's testimony, that the officer failed to identify himself and that the officer used unlawful force on the defendant, which force the defendant instinctively or justifiably resisted. Therefore, had the case been tried on that theory, an instruction would have been proper [based on *Feola*'s exception]. But the defendant did not choose that as an alternate theory of defense. Rather, he chose to defend the case on the theory that the entire occurrence was an accident and that he did not strike the officer at all. This was also a perfectly tenable theory from the testimony of the defendant.

*Id.* In light of the foregoing, *Williams* does not further the Court's specific inquiry.

The decisions in *Perkins, Goodwin,* or *Young,* coupled with *Feola*'s express directive that its holding is "not to be understood as implying that the defendant's state of knowledge is never a relevant consideration," leads the Court to believe that based on the record as its now stands, the question of whether the Defendant knew Special Agent Berry and Mr. Wise were individuals within § 111's scope may be relevant evidence to negate criminal intent. This determination is buttressed by the fact that in limiting its holding in *Feola*, the Supreme Court (as noted above) stated:

> The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of mens rea. For example, *where an officer fails to identify himself or his purpose*, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.

420 U.S. at 686 (emphasis added).

Here, Defendant is asserting a mistake of fact defense. He concedes that the prosecution does not have to prove knowledge as an essential element of the offense. Rather, he argues that his actions were legally justified in that he was defending himself and his property. (Docket 40 at 5-6.) His theory appears to be that, if he had known the men were law enforcement officials, his mistaken belief that they were marauding minions of election fraud perpetrators would have been allayed and he should not have been in fear for the safety of his person and property.

While the parties have proffered various facts and offered detention hearing testimony, and while they agree on many matters, the central facts on whether Defendant's conduct was or was not justified are vigorously disputed. At this point in the prosecution, the Court is ill-equipped to decide such consequential factual matters. Moreover, the Court is disinclined to decide such a momentous issue prior to trial, particularly when, in the end, the question may properly belong to a jury.

When viewing the facts from the Defendant's point-of-view, the record, such as it is at this point, supports Defendant's theory. Whether Defendant offers sufficient facts to support such a defense at trial remains to be seen and, as with all evidence, the Court will entertain appropriate objections. The Defendant will, however, be afforded an opportunity to tell his story to the jury with competent evidence. If, at trial, there is a sufficient evidentiary basis for a *Feola* exception instruction and a legal basis for the instruction, Defendant will be entitled to one. *Mathews v. United States*, 485 U.S. 58, 63 (1988) (stating that it is elemental that a defendant is entitled to a jury instruction if there is a foundation for it in the law and the evidence to support it); *United States v. Stotts*, 113 F.3d 493, 496 (4th Cir.1997) (same). That is a question for another day.

While the *Feola* question presents difficult issues, the law informing the reasonableness of Defendant's conduct is a simpler matter. The reasonableness or unreasonableness of Defendant's actions may be considered by looking to federal and West Virginia law. Under federal law, a defendant may be entitled to a justification/necessity defense if he produces evidence which would allow the fact finder to conclude that he

(1) was under unlawful and present threat of death or serious bodily injury;
(2) did not recklessly place himself in a situation where he would be forced to engage in criminal conduct;
(3) had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm); and
(4) a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*United States v. Crittendon*, 883 F.2d 326, 330 (4th Cir. 1989). "The jurisprudential history of [West Virginia] . . . clearly demonstrates the existence of a public policy favoring an individual's right to defend him/herself." *Felciano v. 7-Eleven, Inc.*, 559 S.E.2d 713 (W. Va. 2001). Under West Virginia law, "[A] person has the right to repel force by force in the defense of his person, his

family or his habitation[.]" *State v. Cook*, 515 S.E.2d 127, 134 (1999) (quoting *State v. W.J.B.*, 276 S.E.2d 550, 554 (1981)). "[A] defendant's use of deadly force must be based upon a reasonable apprehension by the defendant that he or she was at imminent peril of death or serious bodily injury." *State v. Harden*, 679 S.E.2d 628, 633 (W. Va. 2009). The reasonableness of a defendant's belief that he or she was at "imminent" risk of death or serious bodily injury is a two-part inquiry, with a subjective component and an objective component. *Id.* (citing Syl. Pt. 8, *State v. Cain*, 20 W. Va. 679 (1882)). First, a defendant's belief that death or serious bodily injury was imminent must be shown to have been subjectively reasonable, that is, a defendant actually believed, based upon all the circumstances perceived by him or her at the time that deadly force was used, that such force was necessary to prevent death or serious bodily injury. Second, that the defendant's belief must be objectively reasonable when considering all of the circumstances surrounding the defendant's use of deadly force, that is, that another person, similarly situated, could have reasonably formed the same belief. *Harden*, 679 S.E.2d at 635. "[I]n general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation, unless he or she in good faith first withdraws from the combat at a time and in a manner to let the other person know that he or she is withdrawing or intends to withdraw from further aggressive action." *State v. Brooks*, 591 S.E.2d 120, 125 (W. Va. 2003) (citing *State v. Riley*, 976 P.2d 624, 627 (1999)).

Additionally, West Virginia, like many states, has a "castle" or "stand your ground" law. *See* W. Va. Code § 55-7-22.[2] This statute provides civil immunity for persons whose conduct falls

---

[2] West Virginia Code § 55-7-22 provides:

**§ 55-7-22. Civil relief for persons resisting certain criminal activities**

(continued...)

15

within its purview. Generally, the statute provides that a person may use reasonable and proportionate force—including deadly force—against an intruder in his home if the person reasonably believes the intruder intends to kill or seriously harm a household resident, or that the

---

²(...continued)
(a) A lawful occupant within a home or other place of residence is justified in using reasonable and proportionate force, including deadly force, against an intruder or attacker to prevent a forcible entry into the home or residence or to terminate the intruder's or attacker's unlawful entry if the occupant reasonably apprehends that the intruder or attacker may kill or inflict serious bodily harm upon the occupant or others in the home or residence or if the occupant reasonably believes that the intruder or attacker intends to commit a felony in the home or residence and the occupant reasonably believes deadly force is necessary.
(b) A lawful occupant within a home or other place of residence does not have a duty to retreat from an intruder or attacker in the circumstances described in subsection (a) of this section.
(c) A person not engaged in unlawful activity who is attacked in any place he or she has a legal right to be outside of his or her home or residence may use reasonable and proportionate force against an intruder or attacker: Provided, That such person may use deadly force against an intruder or attacker in a place that is not his or her residence without a duty to retreat if the person reasonably believes that he or she or another is in imminent danger of death or serious bodily harm from which he or she or another can only be saved by the use of deadly force against the intruder or attacker.
(d) The justified use of reasonable and proportionate force under this section shall constitute a full and complete defense to any civil action brought by an intruder or attacker against a person using such force.
(e) The full and complete civil defense created by the provisions of this section is not available to a person who:
   (1) Is attempting to commit, committing or escaping from the commission of a felony;
   (2) Initially provokes the use of force against himself, herself or another with the intent to use such force as an excuse to inflict bodily harm upon the assailant; or
   (3) Otherwise initially provokes the use of force against himself, herself or another, unless he or she withdraws from physical contact with the assailant and indicates clearly to the assailant that he or she desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force.
(f) The provisions of this section do not apply to the creation of a hazardous or dangerous condition on or in any real or personal property designed to prevent criminal conduct or cause injury to a person engaging in criminal conduct.
(g) Nothing in this section shall authorize or justify a person to resist or obstruct a law-enforcement officer acting in the course of his or her duty.

intruder intends to commit another felony and the person reasonably believes deadly force is necessary. W. Va. Code § 55-7-22(a). Under this provision, the person has no legal duty to retreat from such an intruder. W. Va. Code § 55-7-22(b). The statute also provides that a person who is not engaged in unlawful activity may use reasonable and proportionate force in any place outside the home that he has a legal right to be, although the use of deadly force is only permitted if the person reasonably believes he or another person is in imminent danger of death or serious bodily harm. W. Va. Code § 55-7-22(c). The statute, however, does not "authorize or justify a person to resist or obstruct a law-enforcement officer acting in the course of his or her duty." W. Va. Code Ann. § 55-7-22(g). These provisions may be relevant to the question of whether Defendant acted reasonably or unreasonably.

### III. CONCLUSION

Accordingly, for the reasons given at the April 18, 2012, pre-trial motions hearing, the Court **DENIES AS MOOT** Defendant's Motion to Suppress Evidence from Intercepted Telephone Communication [Docket 34], **DENIES AS MOOT** Defendant's Motion in Limine [Docket 36], and **DEFERS** ruling on the United States' Motion to Admit Specific Instances of Conduct in Rebuttal to Character Evidence as to James A. Matheny [Docket 35].

For the reasons stated above, the Court **DENIES WITHOUT PREJUDICE** the United

States' Motion in Limine to Exclude Any Reference to Defendant's Knowledge of the Victim's Status [Docket 33.]

    **IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                  ENTER:    May 8, 2012

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE